2006 VT 58

## Jeffrey Mason v. Susan Mason

[904 A.2d 1164]

No. 04-434

Present: **Dooley, Johnson and Skoglund, JJ., and Burgess, D.J. and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed June 16, 2006

*Stephen Alan Dardeck* and *Pamela Gatos* of *Tepper Dardeck & Levins*, Rutland, for Plaintiff-Appellee.

*Jon S. Readnour* and *Kurt A. Kuehl* of *Readnour & Barone*, Rutland, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Wife appeals an order of the family court enforcing the court's final divorce decree by requiring wife to transfer to husband 8,033 shares of stock. We affirm.

¶ 2. The divorce decree in this case was based on and incorporated the parties' stipulation, which sought to divide a single item of marital property: 48,200[1] shares of Union Bank stock held by wife. Unbeknownst to husband, while the parties were negotiating the stipulation, wife received notice of an impending stock split, although the split did not actually take place until several days after the parties signed the stipulation and the divorce decree was entered. The upshot of this timing was that husband received post-split shares of a drastically reduced value. Thus, it appeared during negotiations that husband would receive shares equivalent to roughly one-third of the total stock value, but he ended up receiving shares that represented only one-fifth of the total stock value. We conclude that, because the entitlement to the stock split vested before the parties signed the stipulation and before the divorce was final, the 16,066 shares awarded to husband in the stipulation carried with them the entitlement to the stock split once it occurred.

I.

¶ 3. Wife and husband negotiated a divorce stipulation that purported to divide the marital property between them. Among the provisions of the stipulation was a paragraph acknowledging that the parties would retain their own investments and property that was in their individual names, with the exception of a certain number of shares of stock in wife's name. With respect to this asset, the stipulation provided that wife was to transfer 16,066[2] shares of stock to husband

---

[1] The parties based their division on the 48,200 shares wife held as of December 2002 — a date prior to wife's sale of a substantial portion of the shares to fund the purchase of property.

[2] 16,066 shares represents one-third of the 48,200 shares wife held as of December 2002. The fact that the parties were basing the division of property on a number of shares held at a specific time in the past may explain why husband's award was described in terms of a specific number of shares rather than a specific value in or percentage of currently held shares.

"immediately." Wife signed the stipulation on August 4, 2003, and husband signed on August 6, 2003. The family court entered its final decree of divorce, which incorporated the stipulation, on August 6, 2003.

¶ 4. Although she did not raise the issue during the parties' negotiations, wife had known since July 31, 2003, that the stock was due to split sometime in the near future. Wife learned of the split from her financial advisor, who received a notice advising of the split and explaining that the benefits of the stock split would go to all shareholders who were shareholders of record as of July 26, 2003.

¶ 5. Thus, wife was aware of the impending stock split during the parties' negotiations, when she signed the stipulation, and when the court entered its order incorporating the stipulation. At no point did wife share this information with husband (or the court, for that matter); neither did husband discover this information on his own. On August 11, 2003, the stock split three-for-two. Wife took steps to initiate the transfer of shares as early as August 6, 2003, but husband did not receive the 16,066 shares until August 14, 2003. By that date, the value of each individual share of stock had dropped by approximately one-third from its pre-split value. More importantly, rather than receiving one-third of the shares of stock to wife's two-thirds, husband now received only approximately one-fifth of the divided property, while wife retained four-fifths.[3]

¶ 6. Husband filed a motion for relief from judgment which asked the family court to modify the divorce decree to award him the additional shares, emphasizing that wife knew of the impending stock split when she signed the stipulation and alleging that she had fraudulently concealed that information. Husband subsequently withdrew this motion, and instead filed a motion for enforcement, arguing that because the stipulation required wife to transfer the stock to him "immediately," he was entitled to the shares as valued on August 6, 2003 — the day the stipulation was signed and incorporated into the court's order.

## II.

¶ 7. The trial court styled its decision as a ruling on the motion for enforcement, although it considered both of husband's arguments as

---

[3] Again, these ratios are based on the 48,200 shares the parties had agreed to divide, not wife's actual, current holdings in the stock, which at the time of these events had been significantly reduced by wife's decision to sell a portion of her shares.

well as other frameworks for assessing wife's conduct in connection with the stock split. Noting that the stock was the only marital asset the parties were dividing, and that the parties had intended a one-third to two-thirds division (although they memorialized it in the agreement as a specific number of shares — an approach recommended by wife's financial advisor with knowledge of the impending stock split), the family court concluded that the transfer of only 16,066 of the newly-devalued shares following the stock split "was not within the range of reasonable expectations" of the parties when they agreed to the stipulation. The family court emphasized that the devaluation in shares did not affect both parties equally, as it would have had the stock price changed over time as the result of normal market fluctuations, but rather husband's loss was wife's gain. The court considered it inequitable both that wife did not transfer the shares to husband "immediately," as required by the stipulation, and that wife permitted this delay despite the fact that she knew the stock split was taking place at the precise time between signing the stipulation and transferring the shares.

¶ 8. The court acknowledged the policy in favor of voluntary agreements between divorcing parties, but noted that even those agreements may be overcome where there is evidence of fraudulent concealment in the formation of the agreement. The court found that all of the elements of fraudulent concealment were present in this case. The court further noted that other states require divorcing parties to fully disclose all information known to them regarding marital property. Accordingly, the family court rejected wife's contention that the situation was husband's own fault for failing to diligently investigate the stock asset, because candor is the expected mode in the dissolution of a marital relationship. Finally, the court referred to the mandate of 15 V.S.A. § 751, requiring that marital property be distributed equitably.

## III.

¶ 9. We review the family court's factual findings for clear error and will uphold its conclusions if supported by the findings. *Thibodeau v. Thibodeau*, 2005 VT 14, ¶ 7, 178 Vt. 457, 869 A.2d 142 (mem.). Further, we may affirm the decision of the family court under any legal theory that is supported by the record. *Larkin v. City of Burlington*, 172 Vt. 566, 568, 772 A.2d 553, 556 (2001) (mem.) ("[W]e will not reverse the trial court's underlying decision if the record before us reveals any

legal grounds that would justify the result.") (citations omitted). We need not pass on all of the issues raised by the family court in its decision because we conclude there is a more direct route to affirming the result.

¶ 10. There can be no disagreement that the situation engineered by wife and her financial advisor was inequitable and achieved through something less than full candor. The question, however, is whether an equitable result is possible in light of the parties' voluntary agreement, and if so, by what method? While we adopt a different approach from that of the family court, we conclude that result is correct and that there is ample support for that result in the record.

¶ 11. The goal of the stipulation was to divide 48,200 shares of stock between the parties. This number represented the shares wife held in the stock as of December of 2002, shortly before wife sold a number of shares to purchase property, and thus a moment in time when the marital property was still intact. The parties accomplished the desired division by stipulating that wife would transfer 16,066 shares to husband "immediately" — presumably upon finalizing the stipulation, although the text of the stipulation does not clarify this point.

¶ 12. The right to the benefit of the stock split vested in shareholders of record on July 26, 2003. While husband was not a shareholder of record (and did not receive notice of the split for this reason), the stock was still marital property as of this date, and husband gained an entitlement to the split as part of the marital property. This conclusion is further supported by the mechanism of the stock split, which was for shareholders to "receive one additional share of common stock for every two shares they hold of record on July 26, 2003." Thus, the right to the benefits of the split attached to each individual share (or every two shares) referenced in the stipulation, even though the split had yet to take place.

¶ 13. Stated another way, as of July 26, 2003, every two shares allocated by the stipulation now represented not only those two shares but also the right to the additional share that would be generated at some point in the future by the split. Therefore, in awarding the additional 8,033 shares to husband, the family court did not modify the parties' allocation of the marital property, but simply enforced it. See, e.g., *Schwartz v. Haas*, 169 Vt. 612, 614, 739 A.2d 1188, 1190 (1999) (mem.) (holding that "the family court was not modifying its property division or maintenance award but, rather, was seeking to enforce the terms of the decree as originally entered in the face of intransigence by one of the parties"). Wife is not entitled to arbitrarily and unilaterally decide

that the shares allocated by the stipulation and divorce decree represented the post-split shares of August 14, 2003, rather than the pre-split shares of August 6, 2003 — the date the parties signed the agreement and the family court entered its order.

¶ 14. In awarding husband the additional 8,033 shares he was entitled to as a result of the stock split, the family court reasoned as follows: "Had the stock been held under both parties' names, Mr. Mason would have been a shareholder of record on July 2[6], 2003[,] and would have been entitled to the additional shares as a matter of law, had the shares been transferred on the date of the hearing." But what the family court overlooked is the fact that, while husband was not a shareholder of record on that date, this does not mean he is not entitled to the benefit of the stock split. Rather, as those benefits vested in wife who was the shareholder of record and holder of the marital property, they vested equally and simultaneously in husband.

¶ 15. We decline to address a number of wife's other arguments in light of our reasoning above, other than to note them here. Wife argues that husband should have taken into account the possibility of a stock split in negotiating the stipulation because stocks are subject to constant fluctuation on the market. In short, she in essence faults husband for failing to exercise due diligence during their negotiations. This argument is moot in light of our resolution above. Wife also argues that the family court could not rule on the allegation of fraud because husband had withdrawn that motion. This point is moot because our ruling is not based on a finding of fraud. Because the court's ruling is properly considered an order to enforce rather than modify the divorce order, and we affirm it as such, we do not address wife's argument that she was entitled to a broader evidentiary hearing before the trial court could modify the order. Because our decision is not premised on the notion that wife failed to transfer the stock "immediately," we do not address wife's arguments related to this finding by the trial court. Finally, our decision does not require us to conclude that the parties intended for the transfer of stock to husband to have a particular, set value. The only relevant factor supporting enforcement is that the entitlement to the split vested in the shares as of July 26, 2003, when the stock was marital property and the subject of the parties' stipulation.

¶ 16. By enforcing husband's entitlement to his designated portion of the marital property, our result in this case serves equity and our policy in favor of voluntary agreements to divide marital property by

supporting the notion that parties should be candid and forthright with one another in negotiating those agreements. *Bendekgey v. Bendekgey*, 154 Vt. 193, 197, 576 A.2d 433, 435 (1990) (noting policy favoring voluntary agreements).

*Affirmed.*